IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MELINDA HAMILTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:20-cv-00488-BP |
| | § | |
| MIKE BLOOMBERG 2020 INC., | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Melinda Hamilton ("Plaintiff") respectfully submits this Response and Brief in Opposition to Defendant's Motion for Summary Judgment to filed by Defendant Mike Bloomberg 2020, Inc.'s ("Defendant", or the "Campaign"). Alternatively, Plaintiff requests that the Court grant Plaintiff leave to file a Second Amended Complaint.

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   LEGAL STANDARD .........................................................................................1

III.  FACTUAL BACKGROUND................................................................................2

IV.  LEGAL ARGUMENT .......................................................................................9

   A.  BREACH OF CONTRACT CLAIM .............................................................9

      1.  Parol Evidence Rule ...........................................................................10

      2.  Subsequent Promises of the Employer ...............................................12

      3.  Plaintiff Hamilton's Damages .............................................................15

   B.  FRAUD CLAIM ...........................................................................................15

      1.  Economic Loss Doctrine .....................................................................15

      2.  Justifiable Reliance .............................................................................19

   C.  PROMISSORY ESTOPPEL CLAIM ...........................................................21

   D.  UNJUST ENRICHMENT CLAIM ...............................................................22

      1.  Written Agreement Does Not Preclude Recovery...............................22

      2.  Campaign Was Unjustly Enriched ......................................................23

   E.  FLSA CLAIM...............................................................................................26

      1.  Defendant is a Covered Enterprise .....................................................26

      2.  Plaintiff is a Covered Individual.........................................................30

V.   CONCLUSION ..................................................................................................31

CERTIFICATE OF SERVICE...........................................................................................32

## **TABLE OF AUTHORITIES**

### CASES

*Ahmed v. Shah*,
   No. 01-13-00995-CV, 2015 WL 222171 (Tex. App.–Houston [1st Dist.] Jan. 15, 2015,
   no pet.) .................................................................................................................................24
*Ameen v. Merck & Co., Inc.*,
   226 F. App'x 363 (5th Cir. 2007) ........................................................................................13
*Anderson v. CitiMortgage*,
   No. 4:10–CV–398, 2011 WL 1113494 (E.D. Tex. Mar. 24, 2011)........................................24
*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .....................................................................................................1, 11
*Atlantic Lloyds Ins. Co. v. Butler*,
   137 S.W.3d 199 (Tex.App.-Houston [1st Dist.] 2004, pet. denied)........................................25
*Baguer v. Spanish Broad. Sys., Inc.*,
   No. 04 Civ. 8393, 2007 WL 2780390 (S.D.N.Y. Sept. 20, 2007)...........................................22
*Baisden v. I'm Ready Prods., Inc.*,
   No. H–08–0451, 2008 WL 2118170 (S.D. Tex. May 16, 2008).......................................21, 23
*Baxter v. PNC Bank Nat'l Ass'n*,
   541 F. App'x 395 (5th Cir. 2013) .........................................................................................23
*Biko v. Siemens Corp.*,
   246 S.W.3d 148 (Tex.App.—Dallas 2007, pet. denied)..........................................................10
*Boekemeier v. Fourth Universalist Soc'y in City of New York*,
   86 F. Supp. 2d 280 (S.D.N.Y. 2000) ...............................................................................28, 29
*Bowrin v. Catholic Guardian Soc'y*,
   417 F. Supp. 2d 449 (S.D.N.Y. 2006) ...................................................................................30
*Boy Scouts of Am. v. Responsive Terminal Sys.*,
   790 S.W.2d 738 (Tex. App.—Dallas 1990, writ denied) .......................................................11
*Brennan v. Arnheim & Neely, Inc.*,
   410 U.S. 512, 93 S.Ct. 1138, 35 L.Ed.2d 463 (1973)............................................................30
*Brown v. Kastle Sys. of Tex. LLC*,
   2010 WL 3342219 (S.D. Tex. Aug. 25, 2010) .......................................................................13
*Burlington N. R. Co. v. Sw. Elec. Power Co.*,
   925 S.W.2d 92, 97 (Tex. App. -- Texarkana 1996), writ granted (June 12, 1997),
   aff'd sub nom. Sw. Elec. Power Co. v. Burlington N. R. R. Co., 966 S.W.2d 467
   (Tex. 1998) ........................................................................................................................24
*Byars v. City of Austin*,
   910 S.W.2d 520 (Tex.App.-Austin 1995, writ denied) ..........................................................12
*Cameron McCrary, et. al. v. Mike Bloomberg 2020, Inc.*,
   Civil Action No.3:20-CV-01264-X, Document 26, (N.D. Tex. February 23, 2021) .................1
*Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*,
   445 S.W.3d 716 (Tex. 2014) ................................................................................................16
*Chevalier v. Lane's Inc.*,
   147 Tex. 106, 213 S.W.2d 530 (1948) ..................................................................................10

*Cohen v. Tour Partners, Ltd evalier v. Lane's Inc.*,
No. 01-15-00705-CV, 2017 WL 1528776 (Tex. App. –Houston [1st Dist.] Apr. 27, 2017,
no pet.) ................................................................................................................24
*Cole v. Kobs & Draft Adver., Inc.*,
921 F. Supp. 220 (S.D.N.Y. 1996) ....................................................................19
*Crawford v. Ace Sign, Inc.*,
917 S.W.2d 12, 13 (Tex. 1996) .........................................................................18
*D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*,
973 S.W.2d 662 (Tex. 1998) .......................................................................17, 18
*David J. Sacks, P.C. v. Haden*,
266 S.W.3d 447 (Tex. 2008) .......................................................................10, 11
*ERI Consulting Eng'rs, Inc. v. Swinnea*,
318 S.W.3d 867 (Tex. 2010) ..............................................................................11
*Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*,
51 S.W.3d 573 (Tex. 2001) ................................................................................19
*Esty v. Beal Bank S.S.B.*,
298 S.W.3d 280 (Tex. App.—Dallas 2009, no pet.) .........................................17
*Fed. Land Bank Ass'n v. Sloane*,
825 S.W.2d 439 (Tex. 1991) ..............................................................................17
*First Bank v. Brumitt*,
519 S.W.3d 95 (Tex. 2017) ..........................................................................10, 11
*First Union Nat. Bank v. Richmont Capital Partners I, L.P.*,
168 S.W.3d 917 (Tex. App.--Dallas 2005, no pet.) ...........................................24
*Fortune Production Co. v. Conoco, Inc.*,
52 S.W.3d 671 (Tex.2000) .................................................................................25
*Garnier v. J.C. Penney Co.*,
863 F. Supp. 139 (S.D.N.Y. 1994) ....................................................................19
*Grant Thornton LLP v. Prospect High Income Fund*,
314 S.W.3d 913 (Tex. 2010) ..............................................................................20
*Haralson v. E.F. Hutton Grp., Inc.*,
919 F.2d 1014 (5th Cir. 1990) ...........................................................................20
*Heldenfels Bros. v. City of Corpus Christi,*,
832 S.W.2d 39 (Tex. 1992) ................................................................................24
*Heller Fin., Inc. v. Grammco Computer Sales, Inc.*,
71 F.3d 518 (5th Cir. 1996) ...............................................................................16
*Herod v. Baptist Foundation of Texas*,
89 S.W.3d 689 (Tex.App.-Eastland 2002, no pet.) ...........................................13
*Hilburn v. Storage Tr. Props., LP*,
586 S.W.3d 501 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ..................17
*Hubacek v. Ennis State Bank*,
317 S.W.2d 30, (1958) ........................................................................................11
*Hurd v. BAC Home Loans Servicing, LP*,
880 F. Supp. 2d 747 (N.D. Tex. 2012) ..............................................................17
*Hyman v. Int'l Bus. Machines Corp.*,
No. 98 Civ. 1371, 2000 WL 1538161 (S.D.N.Y. Oct. 17, 2000) .....................19

*In re Enron Corp. Secs., Derivative & ERISA Litig.*,
   Nos. H–01–3624, G–03–0481, 2010 WL 9077875 (S.D. Tex. Jan. 19, 2010) ..................20, 22
*In re Mercer*,
   246 F.3d 391 (5th Cir. 2001) .........................................................................................................20
*Inglish v. Prudential Ins. Co.*,
   928 S.W.2d 702 (Tex.App.-Houston [1st Dist.] 1996, writ denied) .......................................25
*J.D. Fields & Co., Inc. v. N. Am. Fabricators, LLC*,
   No. H-15-317, 2016 WL 10719872 (S.D. Tex. June 13, 2016) ...............................................21
*Jim Walter Homes, Inc. v. Reed*,
   711 S.W.2d 617 (Tex. 1986) .................................................................................................16, 18
*Joles v. Johnson County Youth Serv. Bureau, Inc.*,
   885 F. Supp. 1169 (D.Ind.1995)....................................................................................................31
*Katz v. DNC Services Corporation*,
   CIVIL ACTION NO. 16-5800, 2019 WL 4752056 (E.D. Pa. Sept. 27, 2019) ........................27
*Lamar Homes, Inc. v. Mid-Continent Cas. Co.*,
   242 S.W.3d 1 (Tex. 2007) ..............................................................................................................16
*LAN/STV v. Martin K. Eby Constr. Co.*,
   435 S.W.3d 234 (Tex. 2014) ..........................................................................................................16
*Laurence v. Atzenhoffer Chevrolet*,
   281 F. Supp. 2d 898 (S.D. Tex. 2003)...........................................................................................21
*Lewis v. Bank of Am., NA*,
   343 F.3d 540 (5th Cir. 2003) .........................................................................................................20
*McDaniel v. JPMorgan Chase Bank, N.A.*,
   No. 1:12-CV-392, 2012 WL 6114944 (E.D. Tex. Dec. 10, 2012) .....................................17, 18
*Medistar Twelve Oaks Partners, Ltd. v. Am. Econ. Ins. Co.*,
   No. CIV.A.H-09-3828, 2010 WL 1996596 (S.D. Tex. May 17, 2010) ...................................18
*Merryman v. JPMorgan Chase & Co.*,
   No. 3:12–CV–2156–M(BH), 2013 WL 497883 (N.D. Tex. Jan. 16, 2013).............................24
*Montgomery County Hosp. Dist. v. Brown*,
   965 S.W.2d 501 (Tex.1998) .....................................................................................................12, 13
*Newington Ltd. v. Forrester*,
   No. 3:08-CV-0864-G, 2008 WL 4908200 (N.D. Tex. Nov. 13, 2008)....................................25
*Orca Assets, G.P., L.L.C. v. JPMorgan Chase Bank, N.A.*,
   No. 05-13-01700-CV, 2015 WL 4736786 (Tex. App.–Dallas Aug. 11, 2015, pet. filed) ........20
*Pearce v. Manhattan Ensemble Theater, Inc.*,
   528 F. Supp. 2d 175 (S.D.N.Y. 2007) ..........................................................................................22
*Rapid Tox Screen LLC v. Cigna Healthcare of Texas Inc.*,
   *No. 3:15-CV-3632-B*, 2017 WL 3658841 (N.D. Tex. Aug. 24, 2017)...................................22
*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000) .......................................................................................................................11
*Richter v. Wagner Oil Co.*,
   90 S.W.3d 890 (Tex. App.—San Antonio 2002, no pet.) ........................................................10
*Shandong Yinguang Chem. Indus. Joint Stock Co. v. Potter*,
   607 F.3d 1029 (5th Cir. 2010) .......................................................................................................19
*Stanley Indus. of S. Fla., Inc. v. J.C. Penney Co.*,
   No. 3:05-CV-2499L, 2006 WL 2432309 (N.D. Tex. Aug. 18, 2006)......................................16

*Stephens v. The Clipper, Inc.*,
No. 3–91–1392, 1992 WL 163659 (N.D. Tex. Mar. 24, 1992)................................10
*Sterling Chems., Inc. v. Texaco Inc.*,
259 S.W.3d 793 (Tex. App.—Houston [1st Dist.] 2007, no pet.)......................17, 18
*Stewart v. Jackson & Nash*,
976 F.2d 86 (2d Cir. 1992)........................................................................19
*Sw. Bell Tel. Co. v. DeLanney*,
809 S.W.2d 493 (Tex. 1991) ................................................................16, 18
*Team Healthcare/Diagnostic Corp. v. Blue Cross and Blue Shield of Tex.*,
No. 3:10-CV-1441-BH, 2012 WL 1617087 (N.D. Tex. May 7, 2012)....................25
*Texas Gen. Hosp., LP v. United Healthcare Servs.*, Inc.,
No. 3:15-CV-02096-M, 2016 WL 3541828 (N.D. Tex. June 28, 2016).................22
*Tony and Susan Alamo Found. v. Sec'y of Labor*,
471 U.S. 290, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985)..........................27, 28, 29
*Total RX Care, LLC v. Greater N. Ins. Co.*,
No. 3:16-cv-2965-B, 2017 WL 3034083 (N.D. Tex. July 17, 2017) .....................22
*Vasquez v. Bridgestone/Firestone, Inc.*,
325 F.3d 665 (5th Cir. 2003) ...............................................................21, 22
*Walia v. Veritas Healthcare Sols., L.L.C.*,
No. 13 Civ. 6935, 2015 WL 4743542 (S.D.N.Y. Aug. 11, 2015)...........................19
*Walker v. Walker*,
No. 14-18-00569-CV, 2020 WL 1951631 (Tex. App.—Houston [14th Dist.]
Apr. 23, 2020)......................................................................................24
*Waller v. DB3 Holdings, Inc.*,
No. 3:07–CV–0491–D, 2008 WL 373155 (N.D. Tex. Feb. 12, 2008)........21, 23, 25
*Williams v. Perot Systems Corp.*,
No. 05–96–00482–CV, 1998 WL 136484 (Tex.App.-Dallas March 11, 1998, no pet.)..........12

## STATUTES

26 U.S.C. § 501(c)(3) ...................................................................................29
29 U.S.C. § 203(r) ......................................................................................28
29 U.S.C. § 203(r)(1)..............................................................................27, 28
29 U.S.C. § 203(s)(1)(A)...............................................................................27
29 U.S.C. § 206(a).......................................................................................30
29 U.S.C. § 207(a)(1) ...................................................................................30
29 C.F.R. § 779.103.....................................................................................31
Fed. R. Civ. P. 56(a)......................................................................................i
Tex. Bus. &. Comm. Code § 26.01 ...................................................................10

## OTHER AUTHORITIES

Chris Smith, Vanity Fair "BLOOMBERG IS PAYING ORGANIZERS $70 OR $80":
BLOOMBERG SPENDS HUGE ON GROUND GAME – THROUGH NOVEMBER, EVEN
IF HE'S OUT," December 16, 2019..............................................................14
Opinion Letter No. FLSA 2005-12NA of Sept. 23, 2005, 2005 DOLWH LEXIS 54; FOH §
11n01 .................................................................................................30
RESTATEMENT (FIRST) OF CONTRACTS § 240 (1932) ......................................11

## I.       INTRODUCTION

This case is about a broken promise to Bloomberg's campaign; an undisputed promise that is and should be enforceable. Defendant does not contest the fact that the Bloomberg campaign lied to Plaintiff and voters when promising his campaign workers would have jobs through the November 2020 election.  Such lies led to Plaintiff's reliance and work for Bloomberg to the exclusion of other candidates and enabled Bloomberg to gain votes and delegates. Texas law imposes legal consequence for such conduct.

Defendant now moves for summary judgment in a motion that rehashes its arguments for dismissal, but under a different, higher legal standard. And while Defendant now supports its motion with (some) evidence, the evidence does not actually contradict the factual allegations of the complaint, and, in many places, actually supports the allegations, without presenting any contradictory facts.[1]

## II.      LEGAL STANDARD

Summary judgment is appropriate when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

---

[1] Judge Brantley Starr, like this Court, denied Defendant's 12(b)(6) Motion in an almost identical case brought by Bloomberg campaign workers in his Court. *Cameron McCrary, et. al. v. Mike Bloomberg* 2020, Inc., Civil Action No.3:20-CV-01264-X, Document 26, (N.D. Tex. February 23, 2021).

### III.    FACTUAL BACKGROUND

1.      Plaintiff is a talented employee with a history of involvement in political campaigns. (App. 49, 50, 102-10, 177-80).

2.      Defendant is the campaign for billionaire and former New York City Mayor Mike Bloomberg. (App. 273-74). Defendant was headquartered in New York, New York with multiple campaign offices in dozens of states. Mike Bloomberg designated Defendant as his official campaign with the Federal Elections Commission.

3.      Defendant reported to the Federal Election Commission that Mike Bloomberg personally donated $1,089,225,532.11 of his own money to Defendant. (App. 15-18, 338-39).

4.      Defendant recruited Plaintiff and others to work for his campaign for the 2020 Democratic Presidential nomination. (App. 1, 3).

5.      Defendant touted to the media and Democratic Party voters that it had built a formidable campaign team made up of Plaintiff and others and told voters that campaign employees would continue working to elect Democrats in Texas and in other states even if Bloomberg quit the race for President as a way to attract Democratic Primary voters. (App. 19-46, 231-32, 272, 281, 283).

6.      In an attempt to attract support of his Mike Bloomberg campaign for President, Mike Bloomberg promised to keep his employees employed working for Democrats through November even if he pulled out of the race as fairly summarized by Dan Kanninen[2], Defendant's States Director, in an email titled "Keeping a Promise": ". . . the answer is to make clear that all organizing staff . . . will be slotted into a position of some sort (location not guaranteed) through November, as the campaign and candidate repeatedly promised." (App. 8, 246, 251)("The Representation").

7.      Kanninen served as a source for media articles that amplified this promise:

---

[2] Kanninen was a seasoned political professional who had worked for the Obama, Hillary Clinton and other political campaigns and was versed on providing information to reporters to help his candidate. (App. 209-18, 238-40).

"[T]he more intriguing part of the Bloomberg campaign's employment pitch is that the field-organizing jobs will go through November, even if he loses this spring. Bloomberg is pledging to deploy a field operation on behalf of whoever becomes the Democratic nominee."

 (App. 19-22, 84-85, 136-37, 237-40).

8.      Mr. Kanninen testified that the message he delivered in the article was approved by the "comms team" of the Bloomberg campaign. (App. 256-57).

9.      Senior Advisor to Defendant, Timothy O'Brien[3] who often spoke to the media, upon consulting campaign literature and Defendant's Campaign Manager Kevin Sheekey, learned that the campaign was telling voters that it would keep its campaign staff employed through November even if Mike Bloomberg pulled out of the race. (App. 272, 281, 283, 317).

10.      Mr. O'Brien was authorized to make such representation when speaking on behalf of the campaign to the media, stakeholders, supporters, and potential supporters, including in Texas. (App.271, 278, 312).

11.      Furthermore, Mr. O'Brien, speaking on behalf of Defendant, conveyed that same message to publications in Texas (as well as nationally on television) in January, February and March of 2020. (App. 19-46, 281-82, 293-94, 312).

12.      In particular, Mr. O'Brien was quoted in Texas Monthly: "for us -- and we've said this a lot publicly now -- we're hiring people for a year. This office [in Texas] is going to be open till November. Everybody is being hired through the election.'" (App. 41, 301-02).

13.      In that same Texas Monthly article for which Mr. O'Brien provided source material in January of 2020, the reporter stated: "[Defendant] also made the unusual promise that those field organizers will keep their jobs through the election in November, whether or not Bloomberg ends

---

[3] O'Brien had been a journalist and columnist with the Wall Street Journal and New York Times and had written a book about Donald Trump before coming to work for Bloomberg. (App. 269-71).

up securing the nomination." (App. 33, 298-99, 300, 306).  "Defendant's Texas Director stated in the article: "The only thing we know is that the field team are the only ones who have positions guaranteed through November, whether Mike Bloomberg is on the ticket or not." (App. 33).

14.      In January of 2020, Mr. O'Brien was on Wolf Blitzer's television program on CNN, wherein he stated: "As we've said repeatedly, this big electoral machine we're building -- we're in 48 states and territories, 2,100 people on the ground -- will be in service of the party or whoever the nominee is." (App. 310, 314-16).

15.      During the hiring process in late January and early February 2020, Defendant's agents including Kerry Billings, Tracy Scott, Caitlin (last name unknown), Lynn Munford, and other employees of Defendant,  orally relayed and acknowledged and affirmed this same publicly made promise to Plaintiff directly, guaranteeing Plaintiff a job through the November election, regardless of Mike Bloomberg remaining in the race through that date (the "Representation"). (App. 129-30, 138-41, 227).

16.      The purpose of the Representation was to reinforce Bloomberg's commitment to voters that he would do anything to beat Trump. (App. 276).

17.      Defendant indicated Texas was a battleground state that it intended to keep its campaign staff employed through the November 2020 election even if Mike Bloomberg dropped out of the race. (App. 30, 43, 292).

18.      According to Defendant's States Director Dan Kanninen, the Representation was officially sanctioned by the campaign for use in employment recruitment, as well as in advertisements. (App. 258).

19.      Moreover, the Representation was approved by Campaign Manager Kevin Sheekey. (App. 281-83).

20.     Concerning recruitment of field campaign staff, the official interview template for organizing staff prepared by the Defendant and used in Plaintiff's interview, it is stated that the position features: "Employment through November 2020 with Team Bloomberg (Location not guaranteed)" (App 1, 130, 243).

21.     Plaintiff and other Bloomberg employees heard and read the above publications from Defendant through its employees and official surrogates espousing the guarantee of employment through November of 2020 for organizing staff who joined the campaign. (App. 66, 85-86, 134-36, 164).

22.     During Plaintiff's employment interview in early February 2020, Defendant's representative used the official interview template, which included a description of the position as being through November of 2020 even if Bloomberg dropped out of the race.  (App. 1, 7, 129).

23.     During Plaintiff's employment interview, Defendant's representative acknowledged and affirmed the Representation to Plaintiff directly in an effort to induce Plaintiff to work for the campaign. (App. 84-85).

24.     Upon being hired, Regional Organizing Director Kerry Billings told Plaintiff in an email "I and the rest of the team look forward to working with you for the rest of the year." (App. 7, 125-26).

25.     Plaintiff and other field organizers relied on this Representation to their detriment, forgoing other employment opportunities. (App. 66-69, 81-82, 113-14).

26.     In agreeing to work for Defendant, Plaintiff refrained from supporting any other Democratic campaign for President. (App. 66-68).

27.     Defendant promised to pay Plaintiff $6,000 per month, beginning in early February 2020 through the election in November of 2020, plus provide employment benefits like paid leave during the COVID-19 crisis and health insurance. (App. 1, 3, 122, 165, 183, 226).

28.     Plaintiff worked hard to earn voter support for Mike Bloomberg contacting voters in person door to door and by phone, mostly working 12 hour days 7 days a week. (App. 1, 55, 57, 74-75, 132-33, 143, 166-68).

29.     Defendant controlled the details of Plaintiff's work, providing training and scripts to be followed when communicating voters and conducting daily meetings to focus field organizers on the message. (App. 55-58, 69-75, 76, 166-67).

30.     Defendant had Plaintiff and other field organizers communicate to voters that Bloomberg was promising to keep people employed in a pitch to win their vote. (App. 167-68, 200-01).

31.     Defendant had an employee handbook that governed employee conduct of Plaintiff setting forth detailed guidelines. (App. 63)

32.     Plaintiff worked 25 hours in excess of overtime hours on average per week. (App. 55, 74-75).

33.     Defendant recorded Plaintiff's hourly wage at $34.51.

34.     After Plaintiff was hired, Defendant through Kevin Sheekey, Texas State Director Ashlea Turner, Kerry Billings Tracy Scott and other employees continued to repeatedly make the Representation to Plaintiff, other employees and potential voters. (App. 138-40, 168-71).

35.     Before and after Plaintiff was hired, Bloomberg himself and his surrogates repeatedly stated to voters in stump speeches and media interviews that campaign workers would continue to have jobs through the November 2020 election even if Mike Bloomberg dropped out of the Presidential race in Texas and other states. (App. 65, 304).

36.     Plaintiff relied on this Representation made after Plaintiff was hired to Plaintiff's detriment, leaving other employment and forgoing other employment opportunities. (App. 51, 64-66, 84-85, 112-13).

37.     On or about March 3, 2020, Bloomberg competed in over a dozen democratic primaries earning over 2.4 million votes (over 6% of all votes cast in all Democratic Presidential primaries) and winning 59 delegates.

https://en.wikipedia.org/wiki/2020_Democratic_Party_presidential_primaries

38.     On or about March 4, 2020, Mike Bloomberg suspended his campaign for the presidency. During a conference call with Plaintiff and other field organizers, Campaign Manager Kevin Sheekey and States Director Dan Kanninen the campaign would be keeping field staff employed through November. (App. 172-73, 342, p. 3)(App. 343, p. 8).

39.     On or about March 10, 2020, Defendant informed Plaintiff that their employment was terminated, and they would be paid through the end of March.

40.     Senior Advisor O'Brien was disappointed that Defendant did not have a campaign in place through the November election and that the campaign workers no longer had jobs. (App. 289).

41.     In total, Plaintiff's wages lost due to reliance on Defendant's Representation and/or Defendant's breach of the Representation total $42,000. (App. 165, 202-03).

42.     On March 9, 2020, Mr. Kanninen acknowledged that the campaign and candidate repeatedly promised employees that they would have jobs through the November election and terminating employees in light of the repeated Representations would be bad for Mike Bloomberg's reputation. (App. 8-9).

43.     Ultimately, Plaintiff was not offered the opportunity to remain with the campaign by Defendant after the March 10, 2020 termination.

44.     Defendant purchased 4,100 cell phones for its employees, including Plaintiff, from Apple, Verizon, Presidio and Insight (headquartered in Arizona). (App. 337-38).

45.     Defendant purchased more than 3,800 laptops for campaign workers, including Plaintiff, from Apple, Verizon, Presidio and Insight (headquartered in Arizona). (App. 338).

46.     The campaign cell phones and lap tops were shipped from the campaign's headquarters in New York or Presidio's warehouse in Maryland directly to campaign field workers across the United States. (App. 338).

47.     Defendant sold campaign swag to voters its website including yard signs, buttons, t-shirts, "You're fired" matchbox, stickers, socks, mugs, totes, hats, bandanna, t-shirts for dogs, and onesies for children, all items featuring Bloomberg campaign logos. (App. 328-29).

48.     The orders for campaign swag made on Defendant's website were fulfilled by Bumperactive in Austin, Texas. (App. 329-31).

49.     24,456 individuals from all fifty states made purchases of Bloomberg campaign swag in the amount of $899,824.43. (App. 331, 334-37).

50.     After she was terminated, Plaintiff Melinda Hamilton earned $23,999.97 working for UPS, the Census Bureau and $1,100 cash for some minor work for two political campaigns.[4] (App. 323). Thus, her lost wages total $16,903.03.

---

[4] In her deposition, Plaintiff Hamilton mistakenly testified she worked full time for Constable Michael Campbell's re-election and made $600 a week.  Hamilton had worked on Constable Campbell's 2016 re-election campaign and explained that the stress from the murder of her grandson and medications given to her for her November 2, 2020 heart attack impacted her ability to remember. (App. 324).

## IV.    LEGAL ARGUMENT
### A.      BREACH OF CONTRACT CLAIM

Defendant avers that Plaintiff cannot assert a breach of oral contract claim here where Plaintiff signed a subsequent written employment agreement. Moreover, Defendant claims that even where its agents made promises of employment through November *subsequent* to the signing of the written (at-will) employment contract, that these assurances were too vague to legally modify the written agreement (i.e., that written agreement would still purportedly contradict the oral agreement for employment through November).

Under these circumstances, there are still genuine issues of material fact as to whether Defendant breached a contract with Plaintiff to employ her through the November election. The oral promises made to Plaintiff prior to and subsequent to the written employment agreement were specific and unequivocal: Regardless of Mike Bloomberg's success in the Democratic primary, Plaintiff would be guaranteed employment through the November election to fulfill the campaign's promise to prioritize the defeat of Donald Trump. Thus, Defendant's claims that this promise is vague or ambiguous are tenuous, at best, as the promise is specific in subject matter, timeframe and purpose.

Moreover, the promise was made repeatedly and publicly by Defendant, the candidate himself and official surrogates in an effort to gain votes and delegates. Allowing Defendant to escape this promise while it made such promise central to its effort to gain votes constitutes unjust enrichment.

Accordingly, Defendant's motion for summary judgment cannot stand, as the undisputed facts, reviewed in the light most favorable to Plaintiff show that: (1) The oral promise prior to the written agreement was collateral to and distinct from the written employment agreement, and (2) The subsequent oral promises to employ Plaintiff through November (i.e., promises made after the

signing of the written agreement) modified that agreement from an at-will agreement, changing its nature to a term employment agreement that in no way contradicts the pre-employment oral promise to employ Plaintiff through November: (3) Defendant would be unjustly enriched if it were allowed to escape its promise: and (4) Plaintiff was entitled to overtime under the FLSA.

### 1.   Parol Evidence Rule

"The elements in a claim for breach of contract are: (1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach." *Richter v. Wagner Oil Co.*, 90 S.W.3d 890, 898 (Tex. App.—San Antonio 2002, no pet.). Defendant relies upon *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450-51 (Tex. 2008), in which it was determined that evidence of an oral agreement capping attorney's fees at $10,000 was inadmissible to alter a written agreement that contained no cap because "[a]n unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *See also Stephens v. The Clipper, Inc.*, No. 3–91–1392, 1992 WL 163659, at *5 (N.D. Tex. Mar. 24, 1992) (dismissing breach-of-oral-contract claim in part because the plaintiff could not introduce oral representations to vary or contradict the terms of the written agreement).

The Texas Statute of Frauds provides that oral contracts performable within one year or in which there has been partial performance are enforceable. Tex. Bus. &. Comm. Code § 26.01; *Biko v. Siemens Corp.*, 246 S.W.3d 148, 161 (Tex.App.—Dallas 2007, pet. denied) (citing *Chevalier v. Lane's Inc.*, 147 Tex. 106, 213 S.W.2d 530 (1948)).

To be sure, under the parol evidence rule, the written, integrated employment agreement precludes enforcement of any prior or contemporaneous agreement that addresses the same subject matter and is inconsistent with its terms. *See First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex.

2017). However, it does not preclude enforcement of an agreement that is "collateral" to and not inconsistent with the written employment agreement. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 875 (Tex. 2010); *Sacks*, 266 S.W.3d at 451; *Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 31 (1958). A collateral agreement is one that is supported by separate consideration and that the parties "might naturally" make separately under the circumstances. *Hubacek*, 317 S.W.2d at 32 (quoting RESTATEMENT (FIRST) OF CONTRACTS § 240 (1932) ); *see also Boy Scouts of Am. v. Responsive Terminal Sys.*, 790 S.W.2d 738, 745 (Tex. App.—Dallas 1990, writ denied) ("To be collateral, the oral agreement must be such as the parties might naturally make separately and would not ordinarily be expected to embody in the writing; further, the allegedly collateral agreement must not be so clearly connected with the principal transaction as to be part and parcel thereof.").

Here, Plaintiff avers that the oral contract is distinct from the written agreement, in that it is supported by separate consideration. Plaintiff's breach of contract claim arises from Defendant's promise that it would continue to employ and pay Plaintiff through the November election no matter what, thus guaranteeing employment in the presidential election through November of 2020.[5]

This promise was made based upon the consideration of Plaintiff foregoing employment with other democratic campaigns throughout the 2020 election cycle. This collateral agreement is not necessarily based upon the written agreement such as to be part and parcel of it, as the

---

[5] Defendant avers that this statement  to Hamilton is "not plausible because, at the time of the alleged representation, Biden was not yet the Democratic nominee. Further, how the Campaign could transfer an employee to work for another campaign is unclear." (ECF No. 84 p. 13). Defendant's commentary on plausibility is not relevant to this motion, nor is it particularly convincing. First, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55. In making this argument, Defendant asks this Court to do this very thing. Second, it is plausible that the Bloomberg campaign anticipated Biden being the nominee in the event of Mr. Bloomberg's loss of the nomination -- there is no doubt that Mr. Biden was a frontrunner in the primary and that he handily won the race by early April of 2020.

cornerstone of this oral agreement is Plaintiff's relinquishment of other employment opportunities in exchange for ongoing loyalty from the Bloomberg Campaign -- a promise that was broken through Plaintiff's termination upon Bloomberg dropping out of the race and the failure of the Campaign to re-employ Plaintiff through the end of the 2020 election cycle in support of the Democratic cause generally.

Accordingly, because Plaintiff has sufficiently demonstrated a collateral oral agreement not dependent or a part of the written employment agreement, this claim must survive the motion to dismiss.

### 2.      Subsequent Promises of the Employer

Even if the oral agreement were deemed contradictory of the written agreement on its face, there is a genuine issue of material fact on whether Defendant, through its agents, subsequently amended that written agreement through repeated promises to employ Plaintiff through November after the written agreement was signed. Plaintiff has testified to this fact. Defendant submits no evidence that renders this testimony implausible, conclusory or unsubstantiated.

The employer must unequivocally indicate its intent to be bound not to discharge the employee except under specified circumstances. *Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998). To be enforceable, an agreement to modify the employment-at-will relationship must be express rather than implied and clear and specific. *See id.* at 502. The test for whether an employer's statement modifies the at-will employment relationship is whether there was a clear and specific express agreement to do so, not whether the employee interpreted the statements as a promise not to fire the employee. *See Williams v. Perot Systems Corp.*, No. 05–96–00482–CV, 1998 WL 136484, at *3 (Tex. App.-Dallas March 11, 1998, no pet.) (citing *Byars v. City of Austin*, 910 S.W.2d 520, 523 (Tex. App.-Austin 1995, writ denied).

Defendant relies primarily upon *Brown v. Kastle Sys. of Tex. LLC*, 2010 WL 3342219, at *24 (S.D. Tex. Aug. 25, 2010), wherein an employee claimed that her employer's promises to her that her job would remain available to her after her surgery modified her status as an at-will employee. *See* 2010 WL 3342219, at *6. She contended that the employer breached the orally modified contract by discharging her after she returned from surgery. *See id.* Despite the employee's claim that she was told that her "job will be there at the same pay" when she got out of the hospital, the court nonetheless concluded that there was no evidence that the employer manifested an intention not to discharge the employee except under specified circumstances. *Id.*

The Court in *Kastle Sys.* relied on authority holding that "*vague*, oral assurances of future job security . . . are insufficient to modify an employee's at-will employment." (emphasis supplied) *See Ameen v. Merck & Co., Inc.*, 226 F. App'x 363, 374 (5th Cir. 2007) ("[W]ith respect to promissory estoppel claims, vague oral assurances of future job security, such as that alleged here, are insufficient to modify an employee's at-will employment status."); *Herod v. Baptist Foundation of Texas*, 89 S.W.3d 689, 693 (.-Eastland 2002, no pet.) (finding that the statement, "you'll just continue on as the chief administrative officer and have those responsibilities," was too vague to modify employment at-will status). In these cases and in the seminal Texas case on this issue, *Montgomery Cty. Hosp.*, 965 S.W.2d 501, the oral promises asserted were all demonstrably vague.

Here, however, the claim is much more specific, as the employer repeatedly made the express assertion that Plaintiff be employed for a specified period of time (through November) and for a specified reason (Bloomberg's number one priority of defeating Trump). So, while the Texas Supreme Court may have concluded that the employee in *Montgomery Cty. Hosp.* was offered only vague assurances that "were too indefinite to constitute an agreement limiting the

13

[employer's] right to discharge [the employee] at will", there is nothing indefinite about a promise to employ someone for a specific time period, for a specific reason, and to complete a specific job. The comments made here are unequivocally definite and were unambiguously made not only to Plaintiff, but also, to the general public.

> "[T]he more intriguing part of the Bloomberg campaign's employment pitch is that the field-organizing jobs will go through November, even if he loses this spring. Bloomberg is pledging to deploy a field operation on behalf of whoever becomes the Democratic nominee."

Chris Smith, Vanity Fair "BLOOMBERG IS PAYING ORGANIZERS $70 OR $80": BLOOMBERG SPENDS HUGE ON GROUND GAME – THROUGH NOVEMBER, EVEN IF HE'S OUT," December 16, 2019. A source for this article was Dan Kanninen, the states director of Defendant's campaign. (Kanninen Dep, p. 138).

Senior Advisor to Defendant, Timothy O'Brien, a journalist formally employed by Bloomberg LLP but retained to speak to media on behalf of the Defendant campaign, conveyed that same message to publications in Texas (as well as nationally on television) in February and March of 2020. In particular, Mr. O'Brien was quoted in Texas Monthly on February 25, 2020: "for us -- and we've said this a lot publicly now -- we're hiring people for a year. This office is going to be open till November. Everybody is being hired through the election.'" ." In that same Texas Monthly article for which Mr. O'Brien provided source material in January of 2020, the reporter stated: "[Defendant] also made the unusual promise that those field organizers will keep their jobs through the election in November, whether or not Bloomberg ends up securing the nomination." In early 2020, Mr. O'Brien was on Wolf Blitzer's television program on CNN, wherein he stated: "As we've said repeatedly, this big electoral machine we're building -- we're in 45 states and territories, 2100 people on the ground -- will be in service of the party or whoever the nominee is."

Not only did Defendant publicly make this promise as part of the campaign platform (i.e., in a manner indicating the unambiguous intent to be bound by it), but in its *internal* official interview template for organizing staff prepared by the Defendant and used in Plaintiff's interview, it is stated that the position features: "Employment through November 2020 with Team Bloomberg (Location not guaranteed)".

Accordingly, unlike all of the cases cited by Defendant, Plaintiff has submitted competent evidence that this employer's post-contract promises were definite, specific and unambiguously demonstrated its intent to be bound. Thus, Plaintiff has met the burden to show that the written agreement was modified by an oral agreement, which rendered it not an at-will employment agreement. Thus, the oral contract here for employment through November is not contradicted by the written employment agreement.

### 3.    Plaintiff Hamilton's Damages

Finally, Defendant avers that, based on Plaintiff's mitigation efforts after her termination from the Bloomberg campaign, she earned more than she would have otherwise earned and thus cannot demonstrate damages in this action.

Plaintiff Hamilton provided a declaration clarifying she earned $25,997 in 2020 after working for Defendant, explaining the stress of her heart attack and death of her grandson as well as the 7 prescriptions she was on resulted in her confusing when she worked for Constable Michael Campbell's re-election.  Thus, Plaintiff Hamilton is claiming $16,903 in lost wages.

### B.    FRAUD CLAIM
### 1.    Economic Loss Doctrine

Defendant asserts the fraud claim must fail due to the "economic loss doctrine", which precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy. (ECF No. 84 at 17-18).

15

"As a general rule, the failure to perform the terms of a contract is a breach of contract, not a tort." *Heller Fin., Inc. v. Grammco Computer Sales, Inc.*, 71 F.3d 518, 527 (5th Cir. 1996) (quotation omitted). Therefore, the economic loss rule under Texas law "generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014); *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 12 (Tex. 2007); *see LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 235–36 (Tex. 2014). "The acts of a party may breach duties in tort or contract alone or simultaneously in both. The nature of the injury most often determines which duty or duties are breached. When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone." *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex. 1991) (quoting *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986)); *see Lamar Homes*, 242 S.W.3d at 12–13 ("In operation, the rule restricts contracting parties to contractual remedies for those economic losses associated with the relationship, even when the breach might reasonably be viewed as a consequence of a contracting party's negligence."). "[A] party states a tort claim when the duty allegedly breached is independent of the contractual undertaking *and* the harm suffered is not merely the economic loss of a contractual benefit." *Chapman Custom Homes*, 445 S.W.3d at 718 (emphasis supplied).

One Northern District of Texas opinion explained, "[i]n determining whether a tort claim is merely a repackaged breach of contract claim, a court must consider: 1) whether the claim is for breach of duty created by contract, as opposed to a duty imposed by law; and 2) whether the injury is only the economic loss to the subject of the contract itself." *Stanley Indus. of S. Fla., Inc. v. J.C. Penney Co.*, No. 3:05-CV-2499L, 2006 WL 2432309, at *5 (N.D. Tex. Aug. 18, 2006). "The

16

burden is on the plaintiff to establish evidence of an independent injury." *McDaniel v. JPMorgan Chase Bank, N.A.*, No. 1:12-CV-392, 2012 WL 6114944, at *7 (E.D. Tex. Dec. 10, 2012) (citing *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 302 (Tex. App.—Dallas 2009, no pet.) and *Sterling Chems., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 797 (Tex. App.—Houston [1st Dist.] 2007, no pet.). "The [economic loss] rule is applicable to a claim for negligent misrepresentation in Texas." *Hurd v. BAC Home Loans Servicing, LP*, 880 F. Supp. 2d 747, 763 (N.D. Tex. 2012) (citing *D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663–64 (Tex. 1998) and *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442–43 (Tex. 1991)).

However, the economic loss rule does not apply when the "duty was independent of any obligation in the [contract], and the alleged damages caused by the breach of that duty extended beyond the economic loss of any anticipated benefit under the . . . contract," *Hilburn v. Storage Tr. Props., LP*, 586 S.W.3d 501, 508 (Tex. App.—Houston [14th Dist.] 2019, no pet.), such as misappropriation of trade secrets even when the parties are bound by a contractual confidentiality agreement.

Likewise, here, the duty alleged under the fraud claim arises from an obligation independent of the written employment contract and the damages to Plaintiff exist outside the terms of the contract. First, the duty in tort arises from Defendant's fraudulent representation that Defendant would continue to employ and pay Plaintiff through the November election 'no matter what, thus guaranteeing employment in the presidential election through November of 2020. As Defendant emphasizes throughout its arguments (particularly concerning the breach of oral contract claim), this is a promise outside of the written employment agreement.

"[A] duty in tort does not lie when the only injury claimed is one for economic damages recoverable under a breach of contract claim." *McDaniel v. JPMorgan Chase Bank, N.A.*, No.

1:12-CV-392, 2012 WL 6114944, at *7 (E.D. Tex. Dec. 10, 2012) (quoting *Sterling Chems., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 796 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) and citing *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986)); *accord Medistar Twelve Oaks Partners, Ltd. v. Am. Econ. Ins. Co.,* No. CIV.A.H-09-3828, 2010 WL 1996596, at *7 (S.D. Tex. May 17, 2010) (quoting *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 13 (Tex. 1996)) ("[T]ort damages are generally not recoverable unless the plaintiff suffers an injury that is independent and separate from the economic losses recoverable under a breach of contract claim."). The independent injuries must be distinct from the "benefit of the bargain." *D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 664 (Tex. 1998). "When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone." *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex. 1991) (quoting *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986)).

Here the independent injuries arising from the fraud are not merely the contractual obligations that Defendant failed to live up to under the employment agreement (i.e., salary and benefits). Rather, Plaintiff alleges that by relying upon Defendant's false representations, Plaintiff refrained from supporting any other Democratic campaign for President and agreed not to disparage Mike Bloomberg during or after her employment with Defendant -- effectively precluding himself from *any* further employment in general in the 2020 presidential election. Thus, Plaintiff's fraud claim does not simply seek damages arising from the contract -- which are for payment of salary and benefits -- but, instead, seeks redress for the injury of being precluded from employment with or personal advocacy for any other Democratic candidate during the election cycle. This is separate and apart from the economic loss that was the subject of the written employment agreement with the Campaign (i.e., loss of salary and benefits from the Campaign).

In sum, the benefit in Defendant's fraudulent misrepresentation goes beyond the written contract because it extends to Plaintiff's employability as a political operative for other campaigns during the election cycle -- Plaintiff relied on the misrepresentation (made outside of the written contract for employment) that Plaintiff's employment would continue through November regardless, and, as a result, she was harmed by tying herself to Bloomberg at the expense of Plaintiff's reputation and employability with other campaigns.[6] And further, the independent injury is Plaintiff's employability throughout the rest of the campaign with other parties now that Bloomberg jumped ship and dumped all field organizers including Plaintiff.

Accordingly, the Court must reject this argument for the dismissal of Plaintiff's fraud claim.

### 2.    Justifiable Reliance

To state a claim for fraud under Texas law, Plaintiff must allege:

(1) the defendant made a representation to the plaintiff; (2) the representation was material; (3) the representation was false; (4) when the defendant made the representation the defendant knew it was false or made the representation recklessly and without knowledge of its truth; (5) the defendant made the representation with the intent that the plaintiff act on it; (6) the plaintiff relied on the representation; and (7) the representation caused the plaintiff injury.

*Shandong Yinguang Chem. Indus. Joint Stock Co. v. Potter*, 607 F.3d 1029, 1032–33 (5th Cir. 2010) (citing *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)).

---

[6] The fraudulent inducement claim does not solely flow from the termination by the Campaign; it flows from the harm they endured by forgoing other opportunities when they were induced to take the job. *Stewart v. Jackson & Nash*, 976 F.2d 86, 88-90 (2d Cir. 1992) (reversing district court's order dismissing fraudulent inducement claims where plaintiff relied on defendants' false statements in accepting employment with defendants); *Walia v. Veritas Healthcare Sols., L.L.C.*, No. 13 Civ. 6935, 2015 WL 4743542, at *8 (S.D.N.Y. Aug. 11, 2015) ("a valid fraud claim can arise out of misrepresentations leading to the acceptance of an at-will employment contract.")); *see also id.* at 13 (citing *Hyman v. Int'l Bus. Machines Corp.*, No. 98 Civ. 1371, 2000 WL 1538161, at *3 (S.D.N.Y. Oct. 17, 2000); *Cole v. Kobs & Draft Adver., Inc.*, 921 F. Supp. 220, 224-26 (S.D.N.Y. 1996); *Garnier v. J.C. Penney Co.*, 863 F. Supp. 139, 143 (S.D.N.Y. 1994)).

Defendant avers that an essential element of the fraud claim—justifiable reliance—is missing here. (ECF No. 84, pp. 18-20). This argument, however, is premature for the summary judgment stage of this litigation. "Texas courts have uniformly treated the issue of justifiable reliance as a question for the factfinder." *In re Enron Corp. Secs., Derivative & ERISA Litig.*, Nos. H–01–3624, G–03–0481, 2010 WL 9077875, at *20 (S.D. Tex. Jan. 19, 2010). Courts "inquire whether—given a fraud plaintiff's individual characteristics, abilities, and appreciation of the facts and circumstances at or before the time of the alleged fraud—it is extremely unlikely that there is actual reliance on the plaintiff's part." *Haralson v. E.F. Hutton Grp., Inc.*, 919 F.2d 1014 at 1026 (5th Cir. 1990). To be sure, a "person may not justifiably rely on a representation if 'there are "red flags" indicating such reliance is unwarranted.'" *Lewis v. Bank of Am., NA*, 343 F.3d 540, 546 (5th Cir. 2003) (quoting *In re Mercer*, 246 F.3d 391, 418 (5th Cir. 2001)). However, "purported red flags are questions of fact for a jury" in the absence of "evidence making actual reliance 'extremely unlikely.'" *Orca Assets, G.P., L.L.C. v. JPMorgan Chase Bank, N.A.*, No. 05-13-01700-CV, 2015 WL 4736786, at *9 (Tex. App.–Dallas Aug. 11, 2015, pet. filed) (citing *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010)).

Here, whether Plaintiff's reliance was justifiable under the circumstances is a question to be decided by a *factfinder* and therefore is not grounds for summary judgment.

Nonetheless, even if the Court were to entertain this claim for the purposes of summary judgment, there is evidence that the written agreement at issue was modified by subsequent oral promises by Defendant that Plaintiff would be employed through November regardless of Mike Bloomberg's success in the primary. As already set forth above, *supra*, Section IV.A.2, subsequent promises of an employer can, under appropriate circumstances, amend an at-will employment agreement, shifting it to a term agreement. In this case, the record evidence demonstrates that there

is at least a genuine issue of material fact concerning this issue -- Plaintiff's testimony of such promises, combined with the very public unequivocal statements of the campaign, as well as the campaign's own internal documentation, demonstrate that Defendant's harbored the clear intention to amend the at-will written employment agreement at issue, converting the agreement to a term employment agreement, which does not contradict the fraudulent misrepresentations that are the basis of this claim.

Accordingly, even on the substance, Defendant's argument must fail.

### C.     PROMISSORY ESTOPPEL CLAIM

Defendant next avers that Plaintiff cannot state a claim for promissory estoppel because the written employment agreement's mere existence precludes such a claim. (ECF No. 84 at 20-21). Plaintiff, however, is not precluded from asserting claims for breach of contract and promissory estoppel even though such claims are inconsistent. *See Baisden v. I'm Ready Prods., Inc.*, No. H–08–0451, 2008 WL 2118170, at *10 (S.D. Tex. May 16, 2008). This is because the contract underlying the claim for breach could later be held as invalid. *See Waller v. DB3 Holdings, Inc.*, No. 3:07–CV–0491–D, 2008 WL 373155, at *6 (N.D. Tex. Feb. 12, 2008).

The Court should allow Plaintiff to pursue its breach of contract and promissory estoppel claims in the alternative. Until an action has reached the point of entering a judgment, Federal Rule of Civil Procedure 8 "allows a plaintiff to explore alternative, mutually exclusive theories." *Laurence v. Atzenhoffer Chevrolet*, 281 F. Supp. 2d 898, 900 (S.D. Tex. 2003); *J.D. Fields & Co., Inc. v. N. Am. Fabricators, LLC*, No. H-15-317, 2016 WL 10719872, at *2 (S.D. Tex. June 13, 2016) ("Although the existence of an enforceable contract may ultimately bar Plaintiff's equitable [promissory estoppel] claims, Plaintiff is permitted to plead these claims as alternatives to its breach of contract claim."). It is well-settled that parties can properly plead alternative theories of liability and recovery and can properly argue alternative claims to the jury. *See Vasquez v.*

*Bridgestone/Firestone, Inc.*, 325 F.3d 665, 674 (5th Cir. 2003); *Total RX Care, LLC v. Greater N.*

*Ins. Co.*, No. 3:16-cv-2965-B, 2017 WL 3034083, at *8 (N.D. Tex. July 17, 2017) (declining to

dismiss promissory estoppel claim because it "survives as an alternative to its breach of contract

claim."). In fact, courts have repeatedly allowed promissory estoppel claims to survive in cases

where breach of contract claims were also being asserted. *See Rapid Tox Screen LLC v. Cigna*

*Healthcare of Texas Inc., No. 3:15-CV-3632-B*, 2017 WL 3658841, at *10 (N.D. Tex. Aug. 24,

2017) (denying motion to dismiss promissory estoppel claim in case with breach of contract

claim); *Texas Gen. Hosp., LP v. United Healthcare Servs.*, Inc., No. 3:15-CV-02096-M, 2016 WL

3541828, at *12 (N.D. Tex. June 28, 2016) (same); *Rapid Tox*, 2017 WL 3658841 (same) (mem.

op.).

Second, the Campaign rehashes its argument concerning justifiable reliance, which, as set

forth above concerning the fraud claim, should be rejected by this Court. *See In re Enron Corp.*

*Secs., Derivative & ERISA Litig.*, 2010 WL 9077875, at *20 ("Texas courts have uniformly treated

the issue of justifiable reliance as a question for the factfinder.").  Indeed, at-will employees can

bring  promissory estoppel claims particularly where the claims involve promises of employment

for a specific duration of time less than one year, like the promises made to Plaintiffs here. See,

e.g.,  *Baguer v. Spanish Broad. Sys., Inc.*, No. 04 Civ. 8393, 2007 WL 2780390, at *6, 5 (S.D.N.Y.

Sept. 20, 2007); *Pearce v. Manhattan Ensemble Theater, Inc.*, 528 F. Supp. 2d 175, 181 (S.D.N.Y.

2007)).

### D.    UNJUST ENRICHMENT CLAIM
### 1.    Written Agreement Does Not Preclude Recovery

Defendant avers that the unjust enrichment claim must fail because the Plaintiff signed an

at-will employment agreement. This case, however, is not based upon the written employment

contract, but, rather, it is about the collateral oral promise to maintain employment through

November. As set forth above, *supra*, Section IV.A.2., the oral agreement Plaintiff sues upon is distinct and separate from the written agreement.

To be sure, "[t]here can be no recovery based on [unjust enrichment] when the same subject matter is covered by an express contract*." See Baxter v. PNC Bank Nat'l Ass'n*, 541 F. App'x 395, 397 (5th Cir. 2013). However, the subject matter of Defendant's fraudulent misrepresentation to Plaintiff (that Plaintiff would be employed through November regardless of Mike Bloomberg's success -- or lack thereof -- in the primary), which forms the basis for unjust enrichment here, is not covered in the formal written employment agreement. Thus, the written agreement does not necessarily preclude recovery for unjust enrichment.

Moreover, in general, Plaintiff is not precluded from asserting claims for breach of contract and unjust enrichment even though such claims might be inconsistent. *See Baisden v. I'm Ready Prods., Inc.*, No. H–08–0451, 2008 WL 2118170, at *10 (S.D. Tex. May 16, 2008). This is because the contracts underlying the claim for breach could later have been held as invalid. *See Waller v. DB3 Holdings, Inc.*, No. 3:07–CV–0491–D, 2008 WL 373155, at *6 (N.D. Tex. Feb. 12, 2008). Indeed, any written contract between Bloomberg and Plaintiff might be unenforceable because Plaintiff may have been fraudulently induced to enter the written contract or the contract might be illusory. Moreover, the terms of the written agreement may be deemed to have been altered by subsequent promises of the Defendant. *See, supra*, Section IV.A.2. Accordingly, the Court must reject Defendant's assertion that the claim must be dismissed due to the presence of a purportedly binding contract.

### 2.    Campaign Was Unjustly Enriched

Defendants next claim that Plaintiff cannot recover under an unjust enrichment theory because Plaintiff did not *directly* provide the campaign with the benefit of primary delegates. Specifically, Defendant claims that the only benefit conferred by Plaintiff on the campaign was

the work on its behalf, for which they were compensated. (ECF No. 84, pp. 22-23). Under Defendant's legally unsupported theory, where a party *indirectly* provides a benefit to another, Texas law does not allow recovery. This assertion, however, has no basis in law.

Under Texas law, "[u]njust enrichment is a quasi-contractual claim that is based on the absence of an express agreement." *Anderson v. CitiMortgage*, No. 4:10–CV–398, 2011 WL 1113494, at *6 (E.D. Tex. Mar. 24, 2011). A plaintiff may recover for unjust enrichment if the defendant has "obtained a benefit from [plaintiff] by fraud, duress, or the taking of an undue advantage."[7] *Merryman v. JPMorgan Chase & Co.*, No. 3:12–CV–2156–M(BH), 2013 WL 497883, at *6 (N.D. Tex. Jan. 16, 2013) (quoting *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)). "A key element of unjust enrichment is that the person sought to be charged wrongly secured or passively received a benefit." *Cohen v. Tour Partners, Ltd.,* No. 01-15-00705-CV, 2017 WL 1528776, at *8 (Tex. App. –Houston [1st Dist.] Apr. 27, 2017, no pet.) citing Ahmed v. Shah, No. 01-13-00995-CV, 2015 WL 222171, at *5 (Tex. App.–Houston [1st Dist.] Jan. 15, 2015, no pet.)

"The unjust enrichment doctrine applies the principles of restitution to disputes which are not governed by a contract between the contending parties." *First Union Nat. Bank v. Richmont Capital Partners I, L.P.,* 168 S.W.3d 917, 931 (Tex. App.--Dallas 2005, no pet.) (citing *Burlington Northern*, 925 S.W.2d at 97). "Unjust enrichment claims are based on quasi-contract and are predicated on the absence of an express contract controlling the circumstances." *First Union Nat. Bank v. Richmont Capital Partners I, L.P.*, 168 S.W.3d 917, 931 (Tex. App.--Dallas 2005, no pet.)

---

[7] "[F]raud, duress or the taking of an undue advantage is not an element of unjust enrichment, even though the doctrine "is typically found to apply" under one of these scenarios. *Walker v. Walker*, No. 14-18-00569-CV, 2020 WL 1951631, at *4 (Tex. App.—Houston [14th Dist.] Apr. 23, 2020) citing *Walker*, 2017 WL 1181359, at *8. "The right to recover under an unjust enrichment theory does not depend on the existence of a wrong" and "[t]o obtain restitution on a theory of unjust enrichment, a wrongful act need not be shown." *Id.* (citing *Walker*, 2017 WL 1181359, at *8-9). Under the doctrine, "one who receives benefits, even passively, which would be unjust to retain ought to make restitution for those benefits." *Id.* at *4.

citing *Fortune Production Co. v. Conoco, Inc*., 52 S.W.3d 671, 683 (Tex. 2000); *Atlantic Lloyds*

*Ins. Co. v. Butler*, 137 S.W.3d 199, 227 (Tex. App.--Houston [1st Dist.] 2004, pet. denied); *Inglish*

*v. Prudential Ins. Co.,* 928 S.W.2d 702, 706 (Tex. App.--Houston [1st Dist.] 1996, writ denied).

Federal courts, applying Texas law, have refused to dismiss claims where there are

allegations, as here, that a party obtained a benefit by fraud or undue advantage. *See, e.g., Team*

*Healthcare/Diagnostic Corp. v. Blue Cross and Blue Shield of Tex.*, No. 3:10-CV-1441-BH, 2012

WL 1617087, *7 (N.D. Tex. May 7, 2012) (denying motion to dismiss unjust enrichment claim

where plaintiff alleged it had conferred a benefit on Defendant and that Defendant obtained benefit

by the taking of an undue advantage); *Newington Ltd. v. Forrester*, No. 3:08-CV-0864-G, 2008

WL 4908200, *3 (N.D. Tex. Nov. 13, 2008) (denying motion to dismiss unjust enrichment claim

where party improperly retained funds of plaintiff); *Waller v. DB3 Holdings, Inc. et al.*, No. 3:07-

CV-0491-D, 2008 WL 373155, *6 (N.D. Tex. Feb. 12, 2008) (denying motion to dismiss unjust

enrichment claim where parties improperly retained withdrawn funds).

As set forth above, there is no doubt that Plaintiff alleges that Defendant perpetrated a fraud

upon and took undue advantage of Plaintiff. Moreover, Plaintiff alleges specifically the benefits

that Defendant reaped from Plaintiff's reliance upon Mike Bloomberg's misrepresentation:

> 74.    Defendant benefited from hiring Plaintiff and touting that it had built a
> campaign team made up of Plaintiff and others for the primary campaign through
> the general election no matter whether Mike Bloomberg earned the Democratic
> nomination.
>
> 75.    Defendant earned millions of votes and 61 delegates in the Democratic
> presidential primary as a direct result of its published campaign promises
> guaranteeing employment to Plaintiff and others, as well as through its actual hiring
> of Plaintiff and others for the purported reason of keeping them employed through
> the end of the general election regardless of Mike Bloomberg's success in the
> primary.
>
> 76.    Plaintiff worked to bolster Defendant's campaign and through his mere
> employment, he presented an image on behalf of the campaign that Defendant (and

the candidate Mike Bloomberg) was working broadly for the Democratic cause and not just for Mike Bloomberg's candidacy.

77.     Defendant was unjustly rewarded by Plaintiff's reliance on Defendant's false Representation with primary delegates for which it did not have to fulfill its promise of maintaining Plaintiff's employment through the general election.

(Plaintiff's Second Amended Complaint, pp. 12-13).

Plaintiff has satisfied the requirements of unjust enrichment as a matter of law here, as there is a clear connection between the Plaintiff's reliance on Defendant's fraudulent misrepresentation (specifically, Plaintiff left other employment, refrained from support for other Democratic candidates for President, as well as agreed to not disparage Mike Bloomberg during or after Plaintiff's employment) and by doing so conferred a direct public relations benefit upon Defendant, which resulted in the receipt of primary delegates that were not justly earned. To be sure, Plaintiff did not possess delegates that Plaintiff worked to earn for Defendant -- however, Plaintiff's actions in relying upon Defendant's materially-false representations resulted in them surrendering a great deal and Defendant receiving an unearned windfall that, otherwise, would not have been available to it.

Accordingly, there are sufficient bases for an unust enrichment claim and Defendant's argument is specious and must be rejected.

### E.     FLSA CLAIM
#### 1.     Defendant is a Covered Enterprise

Finally, Defendant next avers that Plaintiff's FLSA claim cannot stand as a matter of law because a political campaign lacks a "business purpose" and is not engaged in commerce as defined by the FLSA. In general, the fact that Defendant is a political campaign does not necessarily preclude coverage.

Neither the FLSA nor case law clearly state whether enterprise coverage may apply to a political campaign. However, the Supreme Court has made clear that "[t]he statute contains no express or implied exception for commercial activities conducted by religious or other

nonprofit organizations." *Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985). Moreover, the FLSA broadly defines enterprise coverage as "the related activities performed . . . by a person or persons for a common business purpose." Thus, *arguably, it could apply to a political campaign*.

*Katz v. DNC Services Corporation*, CIVIL ACTION NO. 16-5800, 2019 WL 4752056, *7 n. 3 (E.D. Pa. Sept. 27, 2019) (emphasis supplied).

Pursuant to § 207(a)(1) of the FLSA, enterprise coverage applies to any employee who "is employed in an enterprise engaged in commerce or in the production of goods for commerce." The FLSA defines "enterprise" as "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units …" 29 U.S.C. § 203(r)(1). Further, the FLSA provides that "an enterprise engaged in commerce or in the production of goods for commerce" is one that:

> (i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated).

29 U.S.C. § 203(s)(1)(A).

As explained below (*infra*, Section IV.E.2), Plaintiff engaged both in commerce as defined under the FLSA, and Plaintiff avers that other organizers engaged in the same duties as Plaintiff. Accordingly, Plaintiff has sufficiently shown that Plaintiff meets the first prong of the definition of "an enterprise engaged in commerce or in the production of goods for commerce." What remains are Defendant's arguments that 1) they do not meet the FLSA's definition of an "enterprise" because they do not have a business purpose, and 2) they did not do $500,000 in annual business.

First, Defendant contends that Plaintiff has failed to sufficiently allege that Defendant is an 'enterprise' with a 'common business purpose' under § 203(r) because they are nonprofit organizations. However, their nonprofit status does not exempt them from enterprise coverage. The Supreme Court has recognized that "[a]ctivities of eleemosynary, religious, or educational organization[s] may be performed for a business purpose. Thus, where such organizations engage in ordinary commercial activities . . . the business activities will be treated under the [FLSA] the same as when they are performed by the ordinary business enterprise." *Tony & Susan Alamo Foundation v. Sec'y of Labor*, 471 U.S. 290, 297 (1985) (quoting 29 C.F.R. § 779.214(1984)).

In determining whether a nonprofit meets the "common business purpose' requirement, courts review whether the enterprise is engaged in competition in the public with ordinary commercial enterprises. *Id.* at 297. Importantly, and as misconstrued by Defendant – the question is not whether the non-profit organization as a whole "primarily" engages in competition with commercial enterprises but whether the related activities performed by any person or persons for a common business purpose compete with commercial enterprises. 29 U.S.C. § 203(r)(1) (defining "enterprise" as "the related activities performed . . . for a common business purpose"). Because activities of an organization that are not engaged in a "common business purpose" are not included in the definition of enterprise, only the business-purpose related activities performed compromise part of the enterprise. The question is then whether those business-purpose related activities are engaging in competition with ordinary commercial enterprises. *See Tony & Susan Alamo Foundation*, 471 U.S. at 297 (holding that a nonprofit religious organization whose primary purpose included establishing and maintaining an Evangelistic Church had a business purpose and that those related business activities competed with private enterprise); *Boekemeier v. Fourth Universalist Soc'y in City of New York*, 86 F. Supp. 2d 280, 285–86 (S.D.N.Y. 2000) (church

whose primary purpose was charitable could still be covered by the FLSA if its business-purpose activities competed with private enterprise).

While a nuanced distinction, the distinction is necessary both to ensure compliance with the United States Supreme Court precedent and to ensure that the congressional goals codified in the FLSA are followed. *See Tony & Susan Alamo Found*., 471 U.S. at 297 (explaining that Congress considered exempting 501(c)(3) organizations in full but did not to ensure that their business activities could not unfairly compete with the private market)

A 501(c)(3) organization, by definition, is "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes[.]" 26 U.S.C. § 501(c)(3). Thus, a 501(c)(3) organization can never "primarily" engage in competition with private enterprise (if they did, they would lose their tax-exempt status) and indeed can never (as a whole) primarily engage in commercial activities. Yet employees of 501(c)(3) organizations may still be covered as employees of a covered enterprise. *See Tony & Susan Alamo Found.*, 471 U.S. at 297; *Boekemeier*, 86 F. Supp. 2d at 285–86. This is because the enterprise test only considers whether the business-purpose related activities, i.e. certain revenue-generating activities performed by the non-profit, compete with the private market. The issue is not whether the non-profit's primary purpose is to compete with private industry; it is only whether the revenue-generating arms of the non-profit engage in competition with private enterprise. *See Boekemeier*, 86 F.Supp.2d at 286 ("Given its nonprofit charitable status, the Church generally would not be considered an 'enterprise' under the Act. However, the Act is applicable to its activities insofar as they serve the general public in competition with ordinary commercial enterprises.")

Defendant misapplies this principle, and as a consequence, Defendant's analysis as to why enterprise coverage should not apply is inherently faulty. Defendant may be subject to enterprise

coverage – even if its primary purpose is political (just as a 501(c)(3) must be organized exclusively for a charitable purpose) – if their revenue-generating activities compete with private enterprise.

The evidence demonstrates that Defendant performed certain business-purpose activities that engage in competition with private industry. Specifically, Plaintiff alleges that Defendant created and sold products – campaign merchandise, including clothing, signs, stickers, et al. Plaintiff's allegations, along with the FEC filings of the Defendant, show that the this merchandise is sold to the general public. Defendant's sale of merchandise competes with other sellers of those same products in the private marketplace.

Here, the campaign admits that it sold campaign merchandise on its website and has produced evidence of sales over $800,000. Accordingly, Plaintiff has satisfied the requirement of showing a business purpose and sales over $500,000.

### 2.     Plaintiff is a Covered Individual.

Under the FLSA's individual coverage provision, any employee "engaged in commerce or in the production of goods for commerce" is covered by the Act, irrespective of whether her employer is an enterprise engaged in commerce as statutorily defined. 29 U.S.C. §§ 206(a), 207(a)(1*); see Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512, 516-17, 93 S.Ct. 1138, 35 L.Ed.2d 463 (1973). Importantly, individual coverage applies to an employee even if the employee is not engaging in such activities for a business purpose. *See Bowrin v. Catholic Guardian Soc'y*, 417 F. Supp. 2d 449, 467 (S.D.N.Y. 2006) ("The WHD clearly recognizes that individual employees of nonprofit organizations who do not engage in substantial competition with other businesses may be covered on an individual basis.") (citing Opinion Letter No. FLSA 2005-12NA of Sept. 23, 2005, 2005 DOLWH LEXIS 54; FOH § 11n01).

Employees are engaged in commerce "when they are performing work involving or related to the movement of persons or things (whether tangibles or intangibles, and including information and intelligence)" between states. 29 C.F.R. § 779.103. As relevant to the instant action, an employee is engaged in commerce when regularly using the mails and telephone for interstate communication, or when regularly traveling across state lines while working. *Id.*; *see also Joles v. Johnson County Youth Serv. Bureau, Inc.*, 885 F. Supp. 1169, 1178 (D.Ind.1995) ("An employee may participate in the actual movement of interstate commerce … by regularly using the instrumentalities of interstate commerce in her work, e.g., regular and recurrent use of interstate telephone, telegraph, mails or travel.").

It is impossible to argue that Defendant who spent over a billion dollars on employees, services and equipment was not engaged in interstate commerce. High level campaign officials worked in New York while filed organizers executed their directives across the United States. Indeed, Defendant touted it campaign was a professional organization that had offices in 45 states employing thousands.  Defendant purchased thousands of Apple laptops and iphones for campaign workers like Plaintiff across the country.  Plaintiff and other field organizers attended conference calls with senior campaign officials like Campaign Manager Kevin Sheekey.

For these reasons, the Court should not grant summary judgment on the FLSA claim.

## V.     CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted,


/s/ JASON C.N. SMITH
JASON C.N. SMITH
State Bar No.   00784999

LAW OFFICES OF JASON SMITH
612 Eighth Avenue
Fort Worth, Texas 76104
Telecopier: (817) 334-0880
Telephone: (817) 334-0898
E-mail: jasons@letsgotocourt.com
ATTORNEYS FOR PLAINTIFF


## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2021, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court and in accordance with the Federal Rules of Civil Procedure.   The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means: Greg W. Curry, J. Meghan McCaig, and Dina McKenney.


/s/ JASON C.N. SMITH
JASON C. N. SMITH